803 A.2d 639

IN THE MATTER OF THE NEW JERSEY INDIVIDUAL
HEALTH COVERAGE PROGRAM'S READOPTION
OF N.J.A.C. 11:20–1 ET SEQ.

Superior Court of New Jersey
Appellate Division

Argued November 14, 2001—Decided May 24, 2002.

**496**

Before Judges STERN, EICHEN and PARKER.

*John M. Pellecchia* argued the cause for appellants *CIGNA Health Care of Northern New Jersey, Inc., CIGNA Health Care of New Jersey, Inc., and Connecticut General Life Insurance Company* (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Pellecchia and Mary Kathryn Roberts,* of counsel; *Kris Ann Cappelluti,* on the brief).

*Eleanor Heck,* Deputy Attorney General, argued the cause for respondent *New Jersey Individual Health Coverage Program Board of Directors* (*John J. Farmer, Jr.,* Attorney General, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Ms. Heck,* on the brief).

*Thomas P. Weidner* argued the cause for intervenor-respondent *The United States Life Insurance Company* (*Windels Marx Lane*

& *Mittendorf,* attorneys; *Mr. Weidner* and *Samuel G. Destito,* of counsel; *David F. Swerdlow and Angelo A. Stio III,* on the brief).

The opinion of the court was delivered by

STERN, P.J.A.D.

CIGNA Health Care of Northern New Jersey, CIGNA Health Care of New Jersey and Connecticut General Life Insurance Company (collectively referred to as "appellants" or "CIGNA") appeal from the re-adoption on August 7, 1998 of the Individual Health Coverage Program ("IHCP" or "IHC Program") regulations by the New Jersey Individual Health Coverage Program Board of Directors ("Board").[1] We granted U.S. Life Insurance Company the right to intervene.[2]

CIGNA argues (1) because the IHCP is "an association of private health insurers and not a state agency," the Board "is not authorized to promulgate regulations," (2) "the readoption with amendments of *N.J.A.C.* 11:20-1 *et seq.* is invalid because the IHC program failed to follow the legislatively mandated procedure for adopting these rules and procedures," (3) "the IHC Program's good faith marketing, second-tier assessment and contested case procedures unlawfully exceed its statutory authority and conflict with the requirements of IHC Act," (4) "the IHC Program's good faith marketing and second-tier assessment requirements are arbitrary, capricious and lead to an unreasonable result" and (5) "even assuming that the IHC Program's good faith marketing

---

[1] There were other revisions in 1998. We address only the regulations attacked on this appeal.

[2] The challenge to the re-adoption of the regulations followed the denial, after a hearing, of CIGNA's challenge to its Individual Health Care Board's 1996 loss assessment. On this appeal, however, we do not address that assessment or any other issue concerning contested facts including the impact of our decision on any assessment which may have been imposed under the new regulations. We leave to appellants and the intervenor the right to address these issues to the Board in light of our conclusion that the Board has jurisdiction to hear those issues.

condition is authorized by statute, it nonetheless fails to contain appropriate standards for carriers seeking to comply with its provisions." We hold that the Board has the power to promulgate regulations and that the "good faith marketing" regulation is valid, but that the "second-tier assessment" with respect to those carriers receiving pro rata first-tier exemptions is invalid. Our holding invalidates *N.J.A.C.* 11:20–2.17, as amended effective August 7, 1998, and we do not address how the Board may make up any "shortfall" with respect to any second-tier assessment actually imposed thereunder.

## I.

The Board was established by the Individual Health Insurance Reform Act, *N.J.S.A.* 17B:27A–2 to –16.5 ("the Act"), to oversee and regulate a program designed to make individual health care coverage available and affordable for those not in a group.[3] *See, generally, In the Matter of Individual Health Coverage Program,* 302 *N.J.Super.* 360, 363–66, 695 *A.*2d 371 (App.Div.1997); *Health Maintenance Org. of N.J. v. Whitman,* 72 *F.*3d 1123, 1124–26 (3d Cir.1995). It does so by assessing those health insurance carriers that do not meet their requirements of enrollment and do not show a good faith effort to do so. CIGNA challenges the amended regulations "as an unlawful act of the Individual Health Coverage Program." Specifically, it contends that, because the program is funded only by assessments against the "health insurers members" and "no public funds are used in the mission or administration of the IHC Program, ... the IHC Program is not a state agency and does not possess the power to promulgate the regulations at issue or to adjudicate contested cases." It further challenges the "good faith marketing precondition to obtaining a statutory pro rata exemption for the obligation of loss sharing" and the "second-tier assessment" of carriers which is designed "to

---

[3] Portions of the Act, including *N.J.S.A.* 17B:27A–12, were amended in 1997 by *L.* 1997, *c.* 146. Unless otherwise noted, all references are to the Act in its current form.

redistribute among non-exempt insurers the losses not shared by exempt and pro rata exempt insurers." CIGNA argues:

> In the re-adoption with amendments at issue, the IHC Program added these unlawful procedures and its contested case procedures ... Each of these provisions exceed the IHC Program's statutory authority and conflicts with the IHC Act. Finally, the IHC Program failed to follow the specific procedures set forth in the IHC act for the taking of actions. Accordingly the IHC Program's actions are invalid.
>
> [Footnote omitted.]

CIGNA therefore asks that the "readoption should be declared null and void, the IHC Program should be directed to readjudicate the loss sharing program for every year since 1993 without the use of the *ultra vires* procedures, and the IHC Program should be directed to adopt its lawful procedures as a Plan of Operation pursuant to the IHC Act." CIGNA tells us that "no hardship will result from a readjudication because the IHC has yet to finally adjudicate the losses for any year since 1992."

The Board emphasizes that the legislation gave it the power to adopt regulations which it claims were drafted to "further and maximize the Legislature's intent in enacting the IHC Act— namely, *to increase the availability of health-insurance coverage in the individual market across as wide a spectrum of that market as possible*," that the regulations are not arbitrary and capricious, that the good faith marketing requirement provides adequate standards for compliance and that there is no basis to invalidate the regulations.

## II.

The IHCP was created pursuant to the Act, adopted in 1992, *see N.J.S.A.* 17B:27A–10(a), as part of a comprehensive overhaul of New Jersey's individual and small-employer health insurance market places. The main purpose of the Act " 'was to ensure that all [New Jersey] citizens would receive the benefits of individual health care coverage.' " *In re Individual Health Coverage Program, supra,* 302 *N.J.Super.* at 363, 695 *A.2d* 371 (App.Div.1997), quoting *Health Maint. Org. of N.J., Inc. v. Whitman, supra,* 72

*F.3d* at 1124–26. The Legislature found that health insurance insurers were reluctant to offer health insurance on an individual basis or "non-group basis" because of the high risks involved. *Health Maint. Org., supra,* 72 *F.*3d at 1126. The result was that individual health insurance was prohibitively expensive for individual consumers and unprofitable for the insurance company. *Ibid.* The goal of the Act, therefore, was to increase the availability of individual health care coverage, spread the cost of insuring higher-risk individuals among New Jersey's entire insurance industry, reduce the cost of individual health care coverage, and increase the profitability of the individual health care market. *Ibid.*

As the Third Circuit explained:

The central component of the Reform Act is the requirement that all carriers in the state pay an "assessment" that is used to defray financial losses incurred by those companies that provide a disproportionate share of the "higher-risk" individual health insurance coverage in the state. . . . Through the assessment, the Reform Act attempts to spread the cost of insuring higher-risk individuals among New Jersey's entire insurance industry in order to reduce the cost to the individual while increasing the profitability of insuring those individuals.

New Jersey carriers are required to "pay or play" with respect to the individual health insurance market. For each carrier, the Board establishes a target goal of individual policies, or more specifically "non-group" policies, that the carrier must issue in a calendar year, if it wishes to obtain an exemption from the assessment. In general, a carrier's target number of non-group policies for the exemption is calculated based on the carrier's proportion of the overall state-wide health coverage market. see [*N.J.S.A.*] 17B:27A–12(d)(3).

The State pools the money collected pursuant to the annual assessment and uses it to reimburse carriers who suffer losses in the individual insurance market during the calendar year.

[*In Re Individual Health Coverage, supra,* 302 *N.J.Super.* at 364, 695 *A.*2d 371, quoting *Health Maint. Org., supra,* 72 *F.*3d at 1125.]

We have previously concluded that the Act has "a rational purpose," *In re Individual Health Coverage Program, supra,* 302 *N.J.Super.* at 369, 695 *A.*2d 371, and that "[t]he 'pay or play' concept with respect to the individual health benefits insurance market built into the statute is a legitimate device to ensure that health insurance coverage is made available to individual residents of this state who are unable to obtain group or employer-based health coverage insurance." *Ibid.*

The IHCP Board consists of nine representatives, four insurance carrier representatives elected by the "members," four individual representatives appointed by the Governor with the advice and consent of the Senate, and the Commissioner of Banking and Insurance or her designee. *N.J.S.A.* 17B:27A–10(b). Within ninety days after the appointment of the initial Board members, the Board was required to submit to the Commissioner "a plan of operation *and thereafter,* any amendments to the plan necessary or suitable to assure the fair, reasonable, and equitable administration of the [IHCP]." *N.J.S.A.* 17B:27A–10(d)(emphasis added). The Commissioner was granted authority to disapprove the plan of operation if "it [was] not suitable to assure the fair, reasonable, and equitable administration of the [IHCP]" and did "not provide for the sharing of program losses on an equitable and proportionate basis in accordance with" the Act. *N.J.S.A.* 17B:27A–10(d).

According to the Act, the Board is required to establish procedures for (1) "the handling and accounting of [IHCP] assets" and to prepare an annual fiscal report to the Commissioner; (2) the collection of assessments from IHCP "members"; (3) the approval of "coverage, benefit levels and contract forms"; (4) the imposition of an "interest penalty for late payment of an assessment", and (5) "any additional matters at the discretion of the board." *N.J.S.A.* 17B:27A–10(f). In addition, the Board was given express authority to:

a. assess members their proportionate share of program losses and administrative expenses in accordance with the [IHCP], and make advance interim assessments, as may be reasonable and necessary for organizational and reasonable operating expenses and estimated losses . . .;

b. establish rules, conditions, and procedures pertaining to the sharing of program losses and administrative expenses among the members of the program;

c. review rate applications and form filings submitted by carriers in accordance with this act;

d. define the provisions of individual health benefits plans in accordance with the requirements of this act;

e. enter into contracts which are necessary or proper to carry out the provisions and purposes of this act;

. . . .

j. sue or be sued, including taking any legal actions necessary or proper for recovery of an assessment for, on behalf of, or against the program or a member. . . .

[*N.J.S.A.* 17B:27A–11.]   4

Under the Act, all insurance companies, health service corporations and health maintenance organizations authorized or licensed to issue health benefit plans in New Jersey are "members" of the IHCP, *N.J.S.A.* 17B:27A–2, –4, and are required to "offer individual health benefits plans" "as a condition of issuing health benefits plans in this State." *N.J.S.A.* 17B:27A–4(a).[5] The plans shall be offered on an "open enrollment, community rated basis," *N.J.S.A.* 17B:27A–4(a), "except that a carrier shall be deemed to have satisfied its obligation to provide the individual health benefits plans by paying an assessment or receiving an exemption pursuant to [*N.J.S.A.* 17B:27A–12]." *N.J.S.A.* 17B:27A–4(a).

As a result, the Act provides two options by which IHCP members may fulfill their statutory obligation. Members may elect not to offer any individual or non-group health coverage. These members, however, must pay an "assessment" to reimburse the losses incurred by the members that do write such policies at a loss ("the [IHCP] losses"). *N.J.S.A.* 17B:27A–12(a)(2). Alternatively, a "member" that elects to offer individual health benefits coverage may obtain "an exemption from the assessment," *N.J.S.A.* 17B:27A–12(d)(1) "by agreeing to enroll its fair share of individuals as determined by the . . . Board." *In re Indiv. Health Coverage, supra,* 302 *N.J.Super.* at 365, 695 *A.*2d 371; *N.J.S.A.* 17B:27A–12(d)(1). "Carriers that seek exemptions may thus reduce or avoid assessment altogether if they meet their enrollment targets." *Ibid.*

The Act sets forth a formula for "the equitable sharing" of IHCP losses:

---

4 Neither *N.J.S.A.* 17B:27–10 nor *N.J.S.A.* 17B:27–11 was amended in 1997.

5 The carrier "shall offer . . . a choice of five individual health benefit plans" as detailed in the Act. *N.J.S.A.* 17B:27A–4(b).

The board shall establish procedures for the equitable sharing of program losses among all members in accordance with their total market share as follows:

. . . .

(2) Every member shall be liable for an assessment to reimburse carriers issuing individual health benefits plans in this State which sustain net paid losses during the two-year calculation period, unless the member has received an exemption from the board pursuant to subsection d. of this section and has written a minimum number of non-group person life years as provided for in that subsection. The assessment of each member shall be in the proportion that the net earned premium of the member for the two-year calculation period preceding the assessment bears to the net earned premium of all members for the two-year calculation period preceding the assessment. . . .

[*N.J.S.A.* 17B:27A–12(a)(2).]

Accordingly, every member pays an assessment unless it has received an exemption by meeting its target enrollment.

The exemption, which is based on the assumption of a sufficient risk by writing individual or non-group plans, is set forth in *N.J.S.A.* 17B:27A–12(d), which provides:

Notwithstanding the provisions of this act to the contrary, a carrier may apply to the board ... for *an exemption from the assessment and reimbursement for losses provided for in this section. A carrier which applies for an exemption shall agree to cover a minimum number of non-group person life years on an open enroll-ment community rated basis,* under a managed care or indemnity plan. . . . *Pursuant to regulations adopted by the board,* the carrier shall determine the number of non-group person life years it has covered by adding the number of non-group persons covered on the last day of each calendar quarter of the two-year calculation period, taking into account the limitations on counting Medicaid recipients and Medicare cost and risk lives, and dividing the total by eight.

. . . .

(3) The minimum number of non-group person life years required to be covered, as determined by the board, shall equal the total number of non-group person life years of community rated, individually enrolled or insured persons, including Medicare costs and risk lives and enrolled Medicaid lives, of all carriers subject to this act for the two-year calculation period, multiplied by the proportion that that carrier's net earned premium bears to the net earned premium of all carriers for that two-year calculation period, including those carriers that are exempt from the assessment.

. . . .

(5) ... To the extent that the carrier has failed to cover the minimum number of non-group person life years established by the board, *the carrier shall be assessed by the board on a pro rata basis for any differential between the minimum number established by the board and the actual number covered by the carrier.*

(6) *A carrier that applies for the exemption shall be deemed to be in compliance with the requirements of this subsection if it has covered 100% of the minimum number of non-group person life years required.*

(7) Any carrier that writes both managed care and indemnity business that is granted an exemption pursuant to this subsection may satisfy its obligation to cover a minimum number of non-group person life years by issuing either managed care or indemnity business, or both.[6]

[Emphasis added.]

Accordingly, members that satisfy their prescribed enrollment targets pay no assessment and are exempted from the assessment. *N.J.S.A.* 17B:27A–12(d)(6). However, as just quoted, the Act mandates that a member pay a "pro rata" assessment for any "differential between the minimum number ... and the actual number" of "non-group" persons insured. *N.J.S.A.* 17B:27A–12(d)(5).

When the Act was first adopted in 1992, it had a phase-in process for granting exemptions. *N.J.S.A.* 17B:27A–12(d)(6)(a)–(c), *deleted by L.* 1997, *c.* 146, § 6. At that time the Act provided:

A carrier that applies for the exemption shall be deemed to be in compliance with the requirements of this subsection if:

(a) by the end of calendar year 1993, it has enrolled or insured at least 40% of the minimum number of non-group persons required;

(b) by the end of calendar year 1994, it has enrolled or insured at least 75% of the minimum number of non-group persons required; and

(c) by the end of calendar year 1995, it has enrolled or insured 100% of the minimum number of non-group persons required.

That phase-in ended in 1995, and as quoted above, *N.J.S.A.* 17B:27A–12(d)(6) currently provides that "[a] carrier that applies for the exemption shall be deemed to be in compliance with the [coverage] requirements [only] if it has covered 100% of the minimum number of non-group person life years required." In addition, when the Act was first adopted in 1992, it declared that no carrier was liable for an assessment which exceeded 35% of the aggregate net paid losses of all carriers, and that the other carriers subject to assessment had to make up any shortfalls.

---

[6] Among other things, the sentence commencing "[p]ursuant to regulations adopted by the board" was added by the 1997 legislation, *L.* 1997, *c.* 146, § 6.

*N.J.S.A.* 17B:27A–12(e), deleted by *L.* 1997, *c.* 146, § 6, provided that:

e. Notwithstanding the provisions of this section to the contrary, no carrier shall be liable for an assessment to reimburse any carrier pursuant to this section in an amount which exceeds 35% of the aggregate net paid losses of all carriers filing pursuant to paragraph (1) of subsection a. of this section. To the extent that this limitation results in any unreimbursed paid losses to any carrier, the unreimbursed net paid losses shall be distributed among carriers: (1) which owe assessments pursuant to paragraph (2) of subsection a. of this section; (2) whose assessments do not exceed 35% of the aggregate net paid losses of all carriers; *and* (3) who have not received an exemption pursuant to subsection d. of this section. For the purposes of paragraph (3) of this subsection, a carrier shall be deemed to have received an exemption notwithstanding the fact that the carrier failed to enroll or insure the minimum number of non-group persons required for that calendar year.

Following enactment of the statute in 1992, the Board adopted regulations, which were scheduled to expire in 1998. 25 *N.J.R.* 4180–4274. These initial regulations were in force during the Act's phase-in period during which a health insurer could obtain a full exemption from the IHCP loss assessment by writing the fixed percentage of the minimum required coverage. The regulations also followed the Act's language governing pro rata assessments for those who did not write their required amount of individual coverage as then provided in *N.J.S.A.* 17B:27A–12(d)(5),(6), and added a good-faith marketing component regarding pro rata exemptions for those who unsuccessfully tried to do so. At the time of the statutory amendment to *N.J.S.A.* 17B:27A–12 in 1997, *N.J.A.C.* 11:20–9.5 provided:

(f) Members receiving final exemptions from the Board shall not be liable for any portion of any assessments for reimbursements for losses for the calendar year for which the final exemption is granted....

1. A member granted a conditional exemption that enrolls or insures fewer than the minimum number of non-group persons allocated to it by the Board shall be liable for a pro rata exemption from assessments for reimbursements for losses based upon the percentage of the minimum number of non-group persons actually enrolled or insured by the member, subject to *a demonstration by the member in writing to the Board that the member has made a good faith effort to enroll or insure the minimum number of non-group persons allocated to it by the Board.*

2. If the Board finds that the member has not made a good faith effort to enroll or insure its minimum number of non-group persons, the Board shall not grant a pro rata exemption to the member. The Board shall notify the member in writing

as to its reasons for not granting the member a pro rata exemption on or before the date that the Board issues bills for assessments for reimbursements for losses for the preceding calendar year.

[*N.J.A.C.* 11:20–9.5 (25 N.J.R. 4196; 26 N.J.R. 1296 (amending *N.J.A.C.* 11:20–9.5(b) to *N.J.A.C.* 9.5(f)).]

In 1994, the Board adopted regulations regarding the procedures for granting and denying exemptions, including a regulation establishing the formula for assessing IHCP losses to members. 26 *N.J.R.* 1507–09. Specifically, *N.J.A.C.* 11:20–2.17 provided:

(c) The Board shall determine each member's assessment amount by multiplying the member's market share, or adjusted market share as applicable, by the total reimbursable net paid losses for the preceding calendar year, except that no member shall be liable for an assessment amount greater than 35 percent of the total reimbursable net paid losses for that calendar year.

1. . . . Members' market shares shall be adjusted in consideration of the following factors, if necessary:

i. A member that has been granted a final exemption under N.J.A.C. 11:20–9.5 shall not be assessed for any portion of the total reimbursable net paid losses.

ii. A member that has been granted a pro rata exemption under N.J.A.C. 11:20–9.5 shall be liable for an assessment determined by multiplying the total amount of reimbursable losses (program losses) for the preceding calendar year by the ratio of the member's net earned premium to the net earned premium of all members for the preceding calendar year multiplied by a fraction, the numerator of which is the difference between the minimum number of non-group persons allocated to the member by the Board and the number of non-group persons actually enrolled or insured by the member and the denominator of which is the minimum number of non-group persons allocated to the member by the Board.

[26 *N.J.R.* 1508 (*N.J.A.C.* 11:20–2.17 (1994)).]

The regulation also established what became known as "the second-tier assessment," to make up any shortfalls because of the Act's declaration in *N.J.S.A.* 17B:27A–12(e), later repealed by *L.* 1997, *c.* 146, § 6, that no carrier was liable for an assessment which exceeded 35% of the aggregate net paid losses of all carriers filing, and that the other carriers liable for the assessment had to make up any shortfalls. *N.J.A.C.* 11:20–2.17(c)(2) provided:

To the extent a member's assessment exceeds the 35 percent limit, the excess amount shall be apportioned to other members, except those members that received a final or pro rata exemption . . ., based upon their respective adjusted market shares until such other members reach the 35 percent limit or the total reimbursable net paid losses for the preceding calendar year are fully assessed, whichever occurs first.

[26 *N.J.R.* 1508 (*N.J.A.C.* 11:20–2.17 (1994)).]

In 1994, the Board also adopted *N.J.A.C.* 11:20–9.6 which required members to submit a report to the Board detailing the efforts they undertook to market and sell individual health benefits plans in order for the Board to determine whether that member made a good-faith effort to enroll the minimum number of individuals. 26 *N.J.R.* 2737–38. Later in 1994, the Board amended *N.J.A.C.* 11:20–9.6 by adding standards by which the Board would review submissions of marketing reports for a determination of whether the members had undertaken a good-faith marketing effort. 26 *N.J.R.* 4193–94. This regulation was also in effect when *N.J.S.A.* 17B:27A was amended in 1997.

Relevant sections of the Act were amended in 1997. *L.* 1997, *c.* 146. Therein, the Legislature (1) changed the assessment cycle to a "two year calculation period" beginning on January 1, 1997, (2) removed the provisions concerning the "phase in" compliance and the 35% limit on any carrier's share of IHCP losses, and (3) deleted the relevant provisions of *N.J.S.A.* 17B:27A–12(d)(6) and 17B:27A–12(e) regarding those subjects.

Thereafter, in June 1998, the Board proposed to re-adopt and amend the regulations, which as originally adopted were set to expire in August 1998. 30 *N.J.R.* 2581–2605 (July 20, 1998). On July 10, 1998, the Board held a hearing on the proposal. Appellants submitted a written objection challenging the Board's status as a state agency and asserting "[t]he IHC Program lacks the rule-making authority to adjudicate contested cases." Appellants also challenged the Board's proposed procedures governing the assessment of carriers for reimbursable losses and the grant or denial of pro rata exemptions, including the Board's requirement that members submit reports concerning their good-faith marketing efforts.

On August 4, 1998 (filed August 7, 1998), the Board re-adopted the regulations with amendments. 30 *N.J.R.* 3289. Thereunder, *N.J.A.C.* 11:20–2.17 establishes a methodology for imposing first or preliminary assessments and the second-tier assessments, the

latter of which is challenged on this appeal. *N.J.A.C.* 11:20–2.17 provides:

*Assessments for total reimbursable net paid losses for two-year calculation periods beginning with 1997 and 1998*

(a) The IHC Program Board may assess members for reimbursable net paid losses as may be necessary, pursuant to its authority under N.J.S.A. 17B:27A–11a and according to the procedures set forth in this Temporary Plan.

(b) The IHC Program Board shall determine the preliminary total reimbursable net paid losses, if any, for the preceding two-year calculation period based upon the information submitted by members no later than March 1 of the year immediately following each two-year calculation period. . . .

1. The total reimbursable net paid losses of the preceding two-year calculation period shall be the aggregate of the reimbursable net paid losses for all members reporting net paid losses for that two-year calculation period.

2. Prior to receiving reimbursement for net paid losses, a member must meet the performance standards set forth at N.J.A.C. 11:20–10.

(c) The Board shall determine each member's assessment amount by multiplying the member's market share, or adjusted market share as applicable, by the total reimbursable net paid losses for the preceding two-year calculation period. *The portion of assessment amounts forgiven to those members granted a final (full or pro rata) exemption shall be redistributed to carriers not receiving a final (full or pro rata) exemption as described in (c)3 below* . . . .

1. The IHC Program Board shall determine each member's market share by comparing the member's net earned premium for all health benefits plans for the preceding two-year calculation period to the net earned premium of all members for the preceding two-year calculation period as reported by each member. . . . Members' market shares shall be adjusted in consideration of the following factors, if necessary:

i. A member that has been granted a full exemption under N.J.A.C. 11:20–9.5 shall not be assessed for any portion of the total reimbursable net paid losses.

ii. A member that has been granted a pro rata exemption under N.J.A.C. 11:20–9.5 shall be liable for an assessment determined by multiplying the total amount of reimbursable losses (program losses) for the preceding two-year calculation period by the ratio of the member's net earned premium to the net earned premium of all members for the preceding two-year calculation period multiplied by a fraction, the numerator of which is the difference between the minimum number of non-group persons allocated to the member by the Board and the number of non-group persons actually enrolled or insured by the member, taking into account the limitations on counting Medicaid recipients and Medicare cost and risk lives, and the denominator of which is the minimum number of non-group persons allocated to the member by the Board. *A carrier that has been granted a pro rata exemption under N.J.A.C. 11:20–9.5 shall not be liable for that portion of the loss assessment that is reapportioned as a result of the granting of final (full or pro rata) exemptions.*

. . . .

3. *Assessment amounts for members granted a final (full or pro rata) exemption by the Board shall be redistributed to the other members not receiving a final (full or pro rata) exemption. The distribution shall be based on an adjusted market share of the members not receiving a final (full or pro rata) exemption.* This adjusted market share shall be the ratio of the member's net earned premium to the net earned premium of all members not receiving a final (full or pro rata) exemption for the preceding two-year calculation period. This additional redistributed portion of the assessment shall be determined by multiplying the total amount of redistributed reimbursable losses from those carriers receiving a final (full or pro rata) exemption for the preceding two-year calculation period by the carrier's market share as adjusted by this paragraph.

[*N.J.A.C.* 11:20–2.17 (emphasis added).]

As we understand the regulations, all carriers are responsible for the first or preliminary assessment unless they have been granted a full exemption. Carriers that write less than their full minimum requirement are responsible for a pro rata assessment. Any shortfall in collections to be used for the reimbursement of IHCP losses, when established, is to be collected and distributed through a "second-tier" assessment. However, any carrier that received either a full or pro rata exemption from the first or preliminary assessment is not subject to the second-tier assessment.

The methodology and procedures for granting final (full or pro rata) exemptions from the initial assessment are found in *N.J.A.C.* 11:20–9.5:

### Procedures for granting or denying final (full or pro rata) exemptions

(a) A member granted a conditional exemption shall be granted a full exemption from assessments for reimbursements for losses for the two-year calculation period in which the conditional exemption was granted if the Board determines that the information filed by the member pursuant to (b) below evidences that the member has enrolled or insured 100 percent of the minimum number of non-group persons allocated to it by the Board for that two-year calculation period.

(b) So that the Board can determine whether the member has satisfied its minimum enrollment share, members seeking final (full or pro rata) exemptions shall report to the Board, on or before March 1 of the year following each two-year calculation period, the number of non-group persons covered by that member on the last day of each calendar quarter of the preceding two-year calculation period. . . .

. . . .

(f) Members receiving full exemptions from the Board shall not be liable for any portion of any assessments for reimbursements for losses for the two-year calculation period for which the full exemption is granted. The Board shall determine, in writing, whether the member is granted a final (full or pro rata) exemption on or before the date that the Board issues bills for assessments for reimbursements for losses for that two-year calculation period.

1. *A member granted a conditional exemption that enrolls or insures fewer than the minimum number of non-group persons allocated to it by the Board, but has enrolled or insured at least 50 percent of the minimum number of non-group persons allocated to it by the Board, shall be granted a pro rata exemption from assessments for reimbursements for losses based upon the percentage of the minimum number of non-group persons actually enrolled or insured by the member.*

2. *A member granted a conditional exemption that enrolls or insures fewer than 50 percent of the minimum number of non-group persons allocated to it by the Board must demonstrate in writing, pursuant to N.J.A.C. 11:20–9.6, that the member has made a good faith effort to enroll or insure the minimum number of non-group persons allocated to it by the Board. The member shall be granted a pro rata exemption from assessments for reimbursements for losses based upon the percentage of the minimum number of non-group persons actually enrolled or insured by the member only if the Board finds that the member has made a good faith effort to enroll or insure its minimum number of non-group persons. The Board shall not grant a pro rata exemption to the member if it finds that the member has not made a good faith effort to enroll its minimum share,* and the Board shall notify the member in writing as to its reasons for not granting the member a pro rata exemption on or before the date that the Board issues bills for assessments for reimbursements for losses for that two year calculation period.

(g) Members denied a pro rata exemption from assessments for reimbursements for losses may, within 20 days of the date of the Board's ruling, appeal the Board's determination and request a hearing pursuant to the procedures set forth at N.J.A.C. 11:20–20.2.

(h) A member requesting a hearing by the Board shall remain liable for the full amount of any assessments for reimbursements for losses issued to it by the Board, until and unless the Board makes a finding that the member is liable for a pro rata assessment only, including any interest that may accrue.

The effect of the regulations, as we understand them, is to grant a full exemption from assessment to carriers that enroll or insure 100 percent of the minimum number of individuals allocated to them by the Board. Pro rata exemptions are granted to all members that insure at least fifty percent of the minimum number of individuals allocated to them. Members that insure less than fifty percent of their target amount may also obtain a pro rata

exemption, but they must meet the Board's good-faith-marketing requirements, which provide in *N.J.A.C.* 11:20–9.6:

### Good Faith Marketing Report

(a) In order for the Board to determine whether a carrier has made a good faith marketing effort as required by N.J.A.C. 11:20–9.5(f)2, members that have received conditional exemptions from assessments for reimbursable losses and have enrolled less than 50 percent of the minimum number of non-group persons determined by the Board shall submit to the Board a marketing report on or before July 1 of the year immediately following the two-year calculation period to which the conditional exemption applies containing the following information pertaining to advertising, marketing and promotion efforts in direct support of sales of standard individual health benefits plans in New Jersey during the two-year calculation period and the calendar quarter immediately preceding the two-year calculation period to which the conditional exemption applies provided such efforts were directed toward sales during the two-year calculation period to which the exemption applies:

1. With respect to print media, the names of newspapers, magazines or other print media, including billboards, in which advertising was placed; the number of times an advertisement appeared in each; the dates those advertisements appeared; the size of the advertisements in each; copies of such advertisements; the total cost of print media advertising;

2. With respect to broadcast media, the names of television stations, radio stations, or cable television franchises over which commercial advertising appeared; the number of times a commercial advertisement was broadcast or played, the time of day and the duration of each; audio or video tapes of such commercial advertisements; the total cost of such broadcast media advertising;

3. With respect to direct marketing by mail or telephone, the number of mailings distributed or calls placed; the approximate dates of the mailings or telephone calls; the geographic areas to which the mailings or calls were addressed; copies of the mailing or scripts of the telephone calls; the total cost of direct marketing through mail or telephone solicitation;

4. With respect to sales through producers licensed by the State of New Jersey, details of efforts to recruit and educate producers to sell standard health benefits plans; the number of producers through whom such sales were made; the total cost of commissions and other incentives paid to producers for sales of standard health benefits plans;

5. With respect to other forms of marketing or promotion of standard health benefits plans, describe the methods of media used; the frequency of use; the total cost of such efforts;

. . . .

(c) The Board will review the marketing reports submitted and determine that a carrier has made a good faith marketing effort as required by N.J.A.C. 11:20–9.5(f)2 if the carrier has demonstrated that it has either:

1. Undertaken a significant media advertising or other marketing campaign, in proportion to its minimum enrollment share, in direct support of sales of standard individual health benefits plans in New Jersey; or

2. Undertaken significant efforts, in proportion to its minimum enrollment share, to educate licensed insurance producers about its standard individual health benefits plans in New Jersey and offered to pay competitive commission schedules for sales of such plans and competitive rates.

(d) A member's failure to file the marketing report described in (a) may result in the Board's denial of a final exemption from assessment for reimbursable losses.

## III.

Appellants contend that the Board had no authority to promulgate any regulations because the IHCP is merely an association of private health insurers and not a state agency. Specifically, appellants argue that the Board cannot exercise the powers of a state agency because it has broad proprietary powers of a private insurance company, including the powers to enter into contracts, and to hire employees and consultants, to sue and to be sued, to borrow money independently of the State, and have those debts carried on the books of the loaning carriers. *N.J.S.A.* 17B:27A–11. Appellants also emphasize that the IHCP is funded exclusively by the assessment of its carrier members and not from state funds. Appellants further claim that the Board is not a state agency as defined by the Administrative Procedure Act ("APA") in *N.J.S.A.* 52:14B 2(a), because the Legislature did not create it in one of the executive departments of State government and because the Legislature did not give it specific administrative rule-making authority or the authority to adjudicate contested cases.

We reject the contention that the Legislature created the IHCP as a private association without rule making or adjudicatory powers. Rather, as it had done in analogous circumstances with respect to automobile insurers, the Legislature adopted the IHCP as a mandatory scheme, to govern the conduct of its carrier members in light of public concern about the availability and cost of coverage. Both the automobile and health insurance industries in New Jersey have always been very highly regulated, and, as the Supreme Court stated in *State Farm Mut. Auto. Ins. Co. v. State*

*of N.J.*, 124 *N.J.* 32, 50, 590 *A*.2d 191 (1991), "a participant in a highly regulated industry must anticipate that its profit levels can be capped or even reduced by changes in government regulation." In fact, in concluding that the " 'pay or play' concept with respect to the individual health benefits insurance market built into the statute is a legitimate device to ensure that health insurance coverage is made available to individual residents of this state who are unable to obtain group or employer-based health insurance coverage," *In re Indiv. Health Coverage, supra,* 302 *N.J.Super.* at 369, 695 *A*.2d 371, Judge Kimmelman cited *In re American Reliance Ins. Co.,* 251 *N.J.Super.* 541, 598 *A*.2d 1219 (App.Div. 1991), *certif. denied,* 127 *N.J.* 556, 606 *A*.2d 369 (1992), which rejected a constitutional attack on the assessment of automobile insurers "in order to create a funding mechanism to cover losses incurred with respect to coverage provided for high-risk drivers." The formula, which involved "a concept not too dissimilar from the 'pay or play' scheme written into the IHC Act," *id.* at 370, was known to the Legislature and upheld in *American Reliance* before this Act was adopted. *Compare Aetna Ins. Co. v. Trans Am. Trucking Serv., Inc.,* 261 *N.J.Super.* 316, 320 n. 4, 618 *A*.2d 906 (App.Div.1993) (Compensation Rating and Inspection Bureau, "CRIB," was not a governmental agency because its member insurance companies choose CRIB's officers, committee members, and employees as representatives of the insurance industry). While four of the IHCP Board members are selected by IHCP member carriers and represent the industry, the Commissioner of Banking and Insurance must approve the selection, and a majority of the Board is composed of the Commissioner, or her designee, and four public members chosen by the Governor, with the advice and consent of the Senate. *N.J.S.A.* 17B:27A–10(b).[7]

---

[7] *N.J.S.A.* 17B:27A–10(b) provides in relevant part:

The board shall consist of nine representatives. The commissioner or his designee shall serve as an ex officio member on the board. Four members of the board shall be appointed by the Governor, with the advice and consent of the Senate: one of whom shall be a representative of an

Accordingly, the Board was created as a public entity administered by representatives of the public to assure that the public interest is best served [8] and protected.

---

employer, appointed upon the recommendation of a business trade association, who is a person with experience in the management or administration of an employee health benefit plan; one of whom shall be a representative of organized labor, appointed upon the recommendation of the A.F.L.-C.I.O., who is a person with experience in the management or administration of an employee health benefit plan; and two of whom shall be consumers of a health benefits plan who are reflective of the population in the State. Four board members who represent carriers shall be elected by the members, subject to the approval of the commissioner, as follows: to the extent there is one licensed in this State that is willing to have a representative serve on the board, a representative from each of the following entities shall be elected:

(1) ... a health service corporation ...;

(2) a health maintenance organization;

(3) a mutual health insurer of this State subject to Subtitle 3 of Title 17B of the New Jersey Statutes; and

(4) a foreign health insurance company authorized to do business in this State.

In approving the selection of the carrier representatives of the board, the commissioner shall assure that all members of the program are fairly represented....

[8] The intervenor notes that the industry representatives have a financial conflict of interest in granting and denying pro rata exemptions based on "good-faith marketing" because they may represent competitor entities. Intervenor claims that Board members use their influence to pick and choose which carriers will receive such exemptions in order to change the distribution of losses. There may be some merit to the contention, *see, e.g., In re Appeal of Progressive Cas. Ins. Co.*, 307 *N.J.Super.* 93, 704 A.2d 562 (App.Div.1997), but in light of our holding regarding the powers of the Board and the carrier's resulting ability to challenge a specific assessment or denial of exemption on a case specific basis, including the ability to assert a specific conflict of one or more Board members in a given case, we cannot void the regulations on that ground. We also note that the Commissioner must "assure that all members of the program are fairly represented" on the Board, *N.J.S.A.* 17B:27A–10(b), and that a majority of the governing committee of the Commercial Automobile Insurance Plan involved in *Progressive*, unlike here, was comprised of industry representatives. *See id.* at 104, 704 A.2d 562. *See also N.J.A.C.* 11:20–20.2(a)(3) (Board makes determination as to whether a matter is a "contested case" and whether to refer it to the OAL) which is premised on the Board's agency status.

Both the case law relating to control of an entity and the legislative history of the IHCP require us to reject appellants' claims that the Board was not created as a state agency for rule making purposes.

When the Act was first enacted in 1992, the Legislature expressly provided that "[t]he board shall, pursuant to the provision of the 'Administrative Procedure Act,' P.L.1968, c. 410 (C.52:14B 1 et seq.) promulgate rules and regulations necessary to effectuate the provisions of sections 1 through 15, inclusive of this act." *L.* 1992, *c.* 161, § 16. Although the following year the Legislature repealed this particular provision, *L.* 1993, *c.* 164, § 12, it continued the Board's rule making authority by inserting *N.J.S.A.* 17B:27A–16.1(h) which expressly gave the Commissioner rule making power and authority to take any "action required or authorized by" the Act, and by adopting *N.J.S.A.* 17B:27A–16.1(g) which provides that "[n]othing in this section shall be construed to prohibit the board from adopting any action pursuant to the provisions of the 'Administrative Procedure Act'. . . ." *L.* 1993, *c.* 164, § 8(g). In fact, *N.J.S.A.* 17B:27A–16.1(a) expressly contemplates rule making authority of the type necessary to establish, readopt and amend regulations to provide for the operation of the IHCP:

a. For the purposes of this section, "action" includes, but is not limited to:

(1) the establishment and modification of health benefits plans;

(2) procedures and standards for the: (a) assessment of members and the apportionment thereof; (b) filing of policy forms; (c) making of rate filings; (d) evaluation of material submitted by carriers with respect to loss ratios; and (e) establishment of refunds to policy or contract holders; and

(3) the promulgation or modification of policy forms.

"Action" shall not include the hearing and resolution of contested cases, personnel matters and applications for withdrawal or exemptions.

[*N.J.S.A.* 17B:27A–16.1(a).]

Moreover, *N.J.S.A.* 17B:27A–16.1(e) expressly refers to the Board's rule making power:

The board may adopt the intended action immediately following the expiration of the public comment period provided in subsection d. of this section, or the hearing provided for in subsection c. whichever date is later. The final action adopted by

the board shall be submitted for publication in the New Jersey Register to the Office of Administrative Law, and shall be effective on the date of the submission or such later date as the board may establish.

Furthermore, *N.J.S.A.* 17B:27A–16.1(f) specifically incorporates the provisions relating to the rule making power of administrative agencies by requiring the Board to file its "actions" with the Office of Administrative Law ("OAL"), pursuant to *N.J.S.A.* 52:14B 5 which deals with rule making. In addition, the 1997 amendment to *N.J.S.A.* 17B:27A–12(d)(1) specifically refers to "regulations adopted by the board" for determining the number of non-group life years that a carrier must cover in order to receive an exemption.

The Legislature's specific reference to the Board's power to adopt regulations, and its specific reference to the rule making authority of the Board, leaves no doubt that rule making was contemplated by the IHCP Board similar to any state agency. Nevertheless, appellants claim that the Board cannot be a state agency because the Legislature, instead of requiring complete compliance with the APA and its rule making provisions, allowed the Board to utilize the independent procedure as developed in *N.J.S.A.* 17B:27A–16.1.[9]

An agency may enforce a statutory provision without promulgating a rule pursuant to the provisions of the APA, if there is an adequate statutory standard for the guidance of the administrative agency. *Airwork Serv. Div. v. Dir., Div. of Taxation,* 97 *N.J.* 290, 300–01, 478 *A.2d* 729 (1984), *cert. denied,* 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.2d* 278 (1985). In such a case, the policy will not be held invalid for failure to meet rule making procedural requirements. *Id.* at 301, 478 *A.2d* 729. *N.J.S.A.* 17B:27A–16.1 is clearly an expedited rule making provision that expressly allows the Board to follow a rule making procedure alternative to the APA. Moreover, we have been presented with no

[9] We bypass consideration of whether the separate or alternative expedited procedure supports the Board's claim that the Legislature intended to supplement and enhance the Board's authority on behalf of the State.

evidence that the Legislature has ever taken action to indicate its disagreement with the Board's interpretation of the Act by voiding either a regulation adopted by the Board or its power to adopt it. This is significant because legislative inaction constitutes tacit approval of agency action, particularly when the Legislature makes other amendments to the same Act, as it did in 1997, without invalidating the administrative interpretation. *Body–Rite Repair Co. v. Dir., Div. of Taxation,* 89 *N.J.* 540, 545–46, 446 *A.*2d 515 (1982). Here, the Legislature had substantial time in which to declare that the Board does not have the status of a state agency or the jurisdiction to exercise rule making power.

Appellants next claim that the Board is not a state agency because it was not established "in" a specific department of the Executive. The Legislature's intent was to place the Board "in, but not of" the Department of Banking and Insurance. *See N.J. Const.* art. V, § 4, ¶ 1 ("[a]ll executive and administrative offices . . . shall be allocated among and within" principal departments in state government). *See also N.J. Executive Com'n on Ethical Standards v. Byrne,* 238 *N.J.Super.* 84, 89–90, 569 *A.*2d 264 (App.Div.1990) (discussing "in, but not of"); *In re Executive Com'n on Ethical Standards Re: Appearance of Rutgers Attorneys,* 222 *N.J.Super.* 482, 485–86, 537 *A.*2d 713 (App.Div.1988) (explaining the origin of "in, but not of"), *rev'd on other grounds,* 116 *N.J.* 216, 561 *A.*2d 542 (1989). In fact, the Commissioner or her designee is required to "serve as an ex officio member on the board", *N.J.S.A.* 17B:27A–10(b), the Commissioner approves the carrier members appointed to the Board, *N.J.S.A.* 17B:27A–10(b), and the Commissioner could disapprove the Board's initial plan of operation, *N.J.S.A.* 17B:27A–10(d).

Furthermore, although its operating expenses are paid by the IHCP member carriers, the Board receives appropriations in the annual budget of the Department of Banking and Insurance, and it makes a presentation as part of the annual report of that Department. The Board's offices are within the Department of

Banking and Insurance, and the Board must submit an annual report to the Commissioner. *N.J.S.A.* 17B:27A–10(f)(1).

Appellants further argue that the Board is not a state agency because the Legislature did not grant it the specific authority to adjudicate contested cases. However, although *N.J.S.A.* 17B:27A–16.1(a) states that the definition of "action" "shall not include the hearing and resolution of contested cases," we do not believe that this provision was designed to prohibit the Board from making or ruling upon the validity of assessments.[10] To the contrary, the Board has the express regulatory and adjudicatory authority to, among other things, (1) assess member carriers their share of program losses and administrative expenses, *N.J.S.A.* 17B:27A–11(a); (2) review rate applications and form filings submitted by carriers, *N.J.S.A.* 17B:27A–11(c); (3) define provisions of standardized health benefits plans, *N.J.S.A.* 17B:27A–11(d); and (4) establish minimum requirements for performance standards for carriers who receive reimbursements for their losses, *N.J.S.A.* 17B:27A–11(i).

In *In re Individual Health Coverage Program, supra,* 302 *N.J.Super.* at 370, 695 *A.*2d 371, we held that the Board did not have to refer a disputed assessment to the OAL because there was no "genuine issue of material fact" warranting a referral, not because of the absence of the power to do so if there were "disputed facts." Indeed, in that case, there was no question raised or suggested with respect to the Board's power to assess the appellant, if it was a IHCP "member" or to rule upon its challenge to the assessment. *See id.* at 366–68, 695 *A.*2d 371. Moreover, we treated the Board like any other agency by applying the general standard of review for administrative agencies, and finding both that the Board's conclusions were "supported by the undisputed facts," and not "arbitrary, capricious or unreasonable,"

---

[10] We do not have to pass upon the scope of the Board's adjudicatory authority in this opinion which deals with the promulgation of regulations. We merely conclude that the definition of "action" in *N.J.S.A.* 17B:27A–16.1(a) does not require invalidation of the regulations.

and that the Board's assessment in that case "did not violate the legislative policy expressed in the IHC Act." *Id.* at 370, 695 *A.*2d 371.

## IV.

■ Appellants contend that the Board's re-adoption of its regulations is invalid because it failed to follow the legislatively-mandated procedures for adopting rules and regulations pursuant to *N.J.S.A.* 17B:27A–16.1 and the Administrative Procedure Act ("APA"), *N.J.S.A.* 52:14B–1 to –15. Specifically, appellants argue that the Board "den[ied] the public a fair opportunity to comment on proposed rules or regulations" because the proposed regulations were not published in the New Jersey Register until ten days after both the public hearing was held and the public comment period had expired.

*N.J.S.A.* 17B:27A–16.1 embodies an independent, expedited rule making procedure. In order to use that procedure, *N.J.S.A.* 17B:27A–16.1(b) requires the Board (1) to provide notice of an "intended action," as defined in the statute, in three newspapers of general circulation in New Jersey, as well as to provide notice and a detailed description of the proposed action to, among others, carriers subject to the provisions of the Act, and (2) to send notice of the proposed action concurrently to the Office of Administrative Law ("OAL") for publication in the *New Jersey Register.* The Board must also provide all interested persons with "an opportunity to comment in writing on the intended action," and the comment period must be at least 20 calendar days from the date of the notice. *N.J.S.A.* 17B:27A–16.1(d). The Board must give "due consideration to all comments received" and "prepare for public distribution a report listing all parties who provided written submissions," summarizing the comments, "and providing the Board's response" thereto. *Ibid.* A copy of that report must be filed with the OAL for publication in the *New Jersey Register.* The Board may adopt the action "immediately following the

expiration of the public comment period ... or the hearing ... whichever date is later." *N.J.S.A.* 17B:27A–16.1(e).

The record before us includes statements at the public hearing and a "Certificate of Proposal, Adoption and Promulgation" indicating compliance with the statutory requirements. In fact, as already noted, the Board received written comments from appellants, as well as written and oral comments from others. Thereafter, it prepared a report which summarized and responded to the comments, and the report was published in the *New Jersey Register;* the regulations were adopted on August 4, 1998, and filed on August 7, 1998. The Notice of Adoption, including the Board's report on the comments it received, was sent to the OAL on August 7, 1998, and published in the *New Jersey Register.* 30 *N.J.R.* 3289 (Sept. 8, 1998).

As the Legislature, in *N.J.S.A.* 17B:27A–16.1, established a specific mechanism for adopting or re-adopting the IHCP regulations incident to the 1997 legislation and the Board adhered to that procedure, we must reject appellants' contention that the Board violated the authorized procedure for adopting or amending its regulations.

## V.

The specific challenges to two of the regulations pose different issues and one of them has merit.

## A.

■ Appellants contend that the good-faith marketing requirements in *N.J.A.C.* 11:20–9.5(f)(2) and 11:20–9.6(1) exceed the Board's rule making authority; (2) are arbitrary, capricious and unreasonable; and (3) lack appropriate standards. While our conclusion may be debatable, we reject these contentions.

Appellants argue that there is no specific authority in the Act for the Board to impose a good-faith marketing requirement in order for a carrier to receive a pro rata exemption. They contend

that the Board lacked the authority to establish the good-faith marketing requirement and argue that *N.J.A.C.* 11:20–9.5(f)(2) and 11:20–9.6 are, in any event, inconsistent with the requirements of law.[11]

The Act requires the "fair, reasonable and equitable" sharing of program losses in a "proportionate" manner. *N.J.S.A.* 17B:27A–10(d); *see also N.J.S.A.* 17B:27A–12(a)(2) requiring assessment of each member which has not written its required coverage. *N.J.S.A.* 17B:27A–12(d)(5) provides that "[t]o the extent that the carrier has failed to cover the minimum number of non-group person life years established by the board, the carrier *shall be assessed by the board on a pro rata basis* for any differential between the minimum number established by the board and the actual number covered by the carrier." (emphasis added.) The wording of this provision presents a colorable basis for the claim that the Board exceeded its authority by relating pro rata exemptions to the imposition of good-faith marketing requirements on carriers that write less than 50% of the minimum required for a full exemption. However, the provision refers to the "minimum number [of individual or non-group policies] established by the board," and the good-faith exemption can be deemed a valid component in creating the "minimum number established by the board."

Given the legislative history as well as the Act's overall intent, and recognizing the presumption in favor of regulations adopted by an agency which administers a subject area with specialized

---

[11] There is no challenge to the specific criteria, including the fifty percent trigger to the "good-faith" requirement of *N.J.A.C.* 11:20–9.5(f)(2), –9.6, if it is otherwise valid. Nor does this appeal involve a challenge to the denial of appellants' request for a good-faith exemption or their 1996 assessment based on the denial of the exemption. In light of our prior holding concerning the Board's powers, those subjects are reserved for consideration in the proper forum. We note, however, that our holding, *infra*, regarding the second-tier assessment may also affect appellants' overall attack on the regulations even if rules of prospectivity do not grant them relief for any assessment before 1998 or its two year calculation period.

expertise, *New Jersey State League of Municipalities v. Department of Community Affairs,* 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999), *Mayflower Securities Co., Inc. v. Bureau of Securities,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973), we conclude that the Board did not exceed its authority by imposing the good-faith marketing requirements. The Legislature's goal was to increase the availability of individual health insurance coverage, spread the cost of insuring high-risk individuals among New Jersey's entire health insurance industry, reduce the cost of individual health care coverage, and increase profitability of the health care market. *In re Indiv. Health Coverage, supra,* 302 *N.J.Super.* at 363–65, 369–70, 695 *A.*2d 371; *Health Maint. Org. of N.J., Inc. v. Whitman, supra,* 72 *F.*3d at 1123–26. Therefore, the Board's development of a program that gives incentives and requires carriers to prove that they made a good-faith effort to enroll their target amount of individual or non-group policyholders during a given calculation period is consistent with the Legislature's intent in establishing the Act and a legitimate component in the determination of the "minimum number" of persons to be covered by each carrier. Stated in "plain language," we have already upheld the "pay or play" program; a carrier must "pay" unless it "plays," and we see no reason in the statute why it cannot be required to show that it really "played," or tried to "play," when it fell more than 50% short.

Indeed, the Board adopted the good-faith marketing requirement in 1994, which was well before the Legislature amended *N.J.S.A.* 17B:27A–12 in 1997. Accordingly, the Legislature could have ended or changed that policy in 1997, but chose not to do so, and "an agency's construction of a statute over a period of years without legislative interference will under appropriate circumstances [particularly when the statute is otherwise revised] be granted great weight as evidence of its conformity with the legislative intent." *Malone v. Fender,* 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979). *See also Body–Rite Repair Co. v. Director, Div. Taxation, supra,* 89 *N.J.* at 545–46, 446 *A.*2d 515. Thus, despite the reference to pro rata assessments in *N.J.S.A.* 17B:27A–

■■■■■■■■■■■■■■■

12(d)(5), the Act does not prohibit the Board from adopting limits on the granting of those exemptions in order to encourage carriers to "play" in good faith by writing their minimum share or close to it.

## B.

■■ Appellants and intervenor contend that the second-tier assessment regulation, *N.J.A.C.* 11:20–2.17, also exceeds the Board's authority and is, in any event, arbitrary, capricious and unreasonable. We agree that this regulation must be declared invalid.

■■■■ We recognize that "[t]he judicial role in reviewing administrative regulations is limited. A court may not invalidate a regulation as long as it is 'within the fair contemplation of the enabling statute' and is neither arbitrary nor unreasonable." *Marsh v. New Jersey Dep't of Environ. Protection*, 152 *N.J.* 137, 149, 703 *A.2d* 927 (1997). *See also N.J. League of Municipalities*, *supra*, 158 *N.J.* at 222, 729 *A.2d* 21 (presumption of validity). Indeed, "[a] finding that an agency acted in an *ultra vires* fashion in adopting regulations is generally disfavored. Particularly, in the field of insurance, the expertise and judgment of the [agency head] may be given great weight." *New Jersey Coalition of Health Care Prof'ls, Inc. v. New Jersey Dep't of Banking and Ins.*, 323 *N.J.Super.* 207, 229, 732 *A.2d* 1063 (App.Div.) (citations omitted), *certif. denied*, 162 *N.J.* 485, 744 *A.2d* 1208 (1999). Consistent with this principle, the Supreme Court has also held that "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities, and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562, 384 *A.2d* 795 (1978). On the other hand, we are not bound by an agency's interpretation of its governing statute or other resolution of a purely legal issue, and we cannot sustain a regulation inconsistent with the legislative will. *Green-*

*wood v. State Police Training Center,* 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992); *Mayflower Securities, supra.*

As we previously developed, when the IHCP was first adopted in 1992, it contemplated that all carriers would be liable for any assessments required to make up any shortfall due to the fact that no carrier could be liable for an assessment which exceeded 35% of the aggregate net paid losses of all carriers. *N.J.S.A.* 17B:17A–12(e). Although that subsection was repealed in 1997, *L.* 1997, *c.* 146, § 6, the Act still mandates full payment of reimbursable losses to those carriers who provide coverage under the IHCP.[12] *N.J.S.A.* 17B:27A–12(a)(*l*)(b) specifically provides that if a carrier's "claims paid for all health benefits plans during the two-year calculation period exceed 115% of the net earned premium and any investment income thereon for the two-year calculation period, the amount of the excess shall be the net paid loss for the carrier that *shall be reimbursable under this act.*" (Emphasis added.) Furthermore, those reimbursements are to be funded by assessments on "[e]very member" of the IHCP "unless the member has received an exemption from the board pursuant to [*N.J.S.A.* 17B:27A–12(d) ] and *has written* a minimum number of non-group person life years as provided for in that subsection." *N.J.S.A.* 17B:27A–12(a)(2). In fact, in order to make the necessary assessments, the Act grants the Board the "specific authority" to "assess members their proportionate share of program losses and administrative expenses in accordance with the provisions of [*N.J.S.A.* 17B:27A–12]." *N.J.S.A.* 17B:27A–11(a). Thus, the Board has an obligation to assess members in a manner that will produce revenues sufficient to ensure that all carriers entitled to reimbursement will receive the full amount of their reimbursable losses.

---

[12] Carriers that issue individual benefit plans must report their earned premiums, claims paid and administrative expenses to the Board, and if the claims paid and administrative expenses exceed the premiums collected and investment income thereon, the excess constitutes the carrier's "net paid loss." *N.J.S.A.* 17B:27A–12(a)(1)(b).

However, under *N.J.A.C.* 11:20–2.17, the existence of a total exemption from the second-tier obligation of those granted pro rata as well as full exemptions may well create a potentially confiscatory payment by the remaining carriers. And because a full reimbursement is mandatory, the Board must reallocate the equivalent of the shortfall through the use of a second-tier assessment or something similar. Indeed, the inclusion of a second-tier calculation is an effective way of furthering legislative intent, especially in light of every member's ability to avoid or diminish its assessment by meeting its enrollment target. Nevertheless, we agree with appellants and intervenor that the Board's second-tier assessment, as presently written, is arbitrary, capricious and unreasonable, or inconsistent with legislative intent, because those who receive a pro rata exemption are completely excused from the second-tier assessment irrespective of the amount of its exemption and the consequences it has with respect to the other carriers who must make up the shortfall (in the absence of the 35% cap that no longer exists). Furthermore, completely excusing carriers with a pro rata exemption from the second-tier assessment is inconsistent with the requirement of *N.J.S.A.* 17B:27A–12(a)(2) that all members "shall be liable" for the "net plan losses" of other members "unless the member" has written its full minimum required coverage.[13] In this connection, we also note that in deleting *N.J.S.A.* 17B:12A–12(e), the Legislature deleted reference to the fact that carriers receiving pro rata exemptions "shall be deemed to have received an exemption [for purposes of making up the shortfall] notwithstanding the fact that the carrier failed to enroll or insure the minimum number of non-group persons required for that calendar year." *L.* 1992, *c.* 161, § 11, *repealed by L.* 1997, *c.* 146, § 6, eff. July 1, 1997.

Under *N.J.A.C.* 11:20–2.17(c), carriers that receive pro-rata exemptions on the first assessment (which is required by and consistent with *N.J.S.A.* 17B:27A–12(d)(5)), are completely exempt

---

[13] It is also inconsistent with the limited pro rata assessment embodied in *N.J.S.A.* 17B:27A–12(d)(5).

from paying any amount in the second-tier assessment. We conclude that this additional exemption, embodied in *N.J.A.C.* 11:20–2.17(c), is arbitrary, capricious and unreasonable, and inconsistent with legislative intent, because there is no authority in the Act for the Board to excuse carriers with pro rata exemptions from paying any second-tier assessments at all, or to be completely exempt from the requirement of reimbursing those carriers entitled to the mandatory payment of their reimbursable losses. As we have noted, although *N.J.S.A.* 17B:27A–12(e), *repealed by L.* 1997, *c.* 146, § 6, originally excluded all members that received any exemption, including pro rata exemptions, from paying any shortfall due to the 35% cap, the Legislature deleted that section in 1997. The Act is now clear that carriers that do not cover their minimum requirements must pay a pro-rata assessment, *N.J.S.A.* 17B:27A–12(d)(5). They must also contribute to reimbursement of the shortfall, particularly in light of *N.J.S.A.* 17B:27A–12(a)(2).[14]

By allowing carriers with pro-rata exemptions to completely avoid the second-tier assessment, the shortfall that was initially created by the Board's granting of exemptions in the first place is magnified among only those carriers that are already paying without any exemption, and only those carriers. However, the Act does not authorize the Board to further penalize carriers who are not entitled to any exemption. The Act penalizes them by prohibiting an exemption but does not require them to underwrite the entire program.

The Board urges us to apply any holding invalidating a regulation prospectively. Since the appeal challenges only the 1998 re-adoption of, or amendments to, the regulations, we decline to apply our decision to the assessments made prior to that year or its "two year calculation period." We are told by appellants that actual assessments have · not yet been made under the 1998 regulations. In any event, we do not address the impact of our

---

[14] We do not preclude the Board's consideration of granting a pro rata exemption on the second-tier.

decision on any carrier that has already paid a second-tier assessment under the invalidated regulation. Nor do we address how the Board may endeavor to collect any "short fall" which may flow from this decision. We leave initial consideration of the impact of our decision to the Board incident to its revision of the regulation.

## VI.

We find no need to address any further contentions in this written opinion. *R.* 2:11–3(e)(1)(D),(E). Except as provided herein with respect to the second-tier assessment embodied in *N.J.A.C.* 11:20–2.17, the regulations promulgated by the IHCP Board are upheld.