695 A.2d 371

IN THE MATTER OF INDIVIDUAL HEALTH COVERAGE PROGRAM FINAL ADMINISTRATIVE ORDERS NOS. 96–01 AND 96–22.

Superior Court of New Jersey
Appellate Division

Argued Telephonically May 28, 1997—Decided June 26, 1997.

Before Judges PETRELLA, WALLACE and KIMMELMAN.

*Benjamin Clarke* argued the cause for appellant (*DeCotiis, Fitzpatrick & Gluck*, attorneys; *Mr. Clarke* and *Elizabeth G. Litten*, on the brief).

*Maria M. Smyth,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Ms. Smyth,* on the brief).

The opinion of the court was delivered by

KIMMELMAN, J.A.D.

At issue are two consolidated appeals filed by First Option Health Plan of New Jersey (First Option), a health maintenance organization (HMO), contesting assessments levied upon it for the years 1994 and 1995 representing reimbursable losses and administrative expenses as administered by the New Jersey Individual Health Coverage Program (IHC Program). *N.J.S.A.* 17B:27A–12; *N.J.A.C.* 11:20–2.1. These assessments are reflected in the final administrative orders under appeal, 96–01 and 96–22, issued by the IHC Program Board of Directors (IHC Board), the entity charged with administering the IHC Program. *See N.J.A.C.* 11:20–2.1(6).

The IHC Program was established pursuant to the Individual Health Insurance Reform Act (IHC Act), *N.J.S.A.* 17B:27A–2 to – 16.5, as part of a comprehensive overhaul of New Jersey's individual and small employer health insurance marketplaces. The purpose and operation of the IHC Act has been well summarized in *Health Maintenance Organization of New Jersey, Inc. v. Whitman,* 72 *F.*3d 1123 (3d Cir.1995), as follows:

> In response to this nation's growing health care crisis, New Jersey enacted the Reform Act to ensure that all its citizens would receive the benefits of individual health care coverage. (Individual health care coverage is coverage offered by an insurance company or health maintenance organization directly to an individual and his or her family. By increasing the availability of individual health care coverage, the State intends to reduce the number of uninsured self-employed or unemployed residents, who often do not have the option of purchasing employer-based or group health coverage).
>
> Under the Reform Act, a non-compensated, nine-member Board of Directors "shall establish the policy and contract forms and benefit levels to be made available" ... [*N.J.S.A.*] 17B:27A–7. In 1993, the Board of Directors devised a program whereby state residents would be offered five standardized individual health plans. The program requires New Jersey health insurance companies and

health maintenance organizations (collectively referred to in the Reform Act as "carriers") to offer state residents the five standardized policies as a condition of continuing to issue any type of health benefit plans in the state. *See* [*N.J.S.A.*] 17B:27A–4[;] 17B:27A–1(a)(3)(c). Carriers were required to start offering the five plans on August 1, 1993.

The central component of the Reform Act is the requirement that all carriers in the state pay an "assessment" that is used to defray financial losses incurred by those companies that provide a disproportionate share of the "higher-risk" individual health insurance coverage in the state. In group health plans, the cost of insuring higher-risk people, individuals who require expensive medical treatment, is spread among the entire insured population. In contrast, when people are individually insured, these costs must be borne by either the individual or the insurance company. As a result, insurance sold on an individual basis may be prohibitively expensive for the consumer and unprofitable for the insurance company. Through the assessment, the Reform Act attempts to spread the cost of insuring higher-risk individuals among New Jersey's entire insurance industry in order to reduce the cost to the individual while increasing the profitability of insuring those individuals.

New Jersey carriers are required to "pay or play" with respect to the individual health insurance market. For each carrier, the Board establishes a target goal of individual policies, or more specifically "non-group" policies, that the carrier must issue in a calendar year if it wishes to obtain an exemption from the assessment. In general, a carrier's target number of non-group policies for the exemption is calculated based on the carrier's proportion of the overall state-wide health coverage market. *See* [*N.J.S.A.*] 17B:27A–12(d)(3).

The State pools the money collected pursuant to the annual assessment and uses it to reimburse carriers who suffer losses in the individual insurance market during the calendar year. The assessment is calculated as the proportion of the carrier's "net earned premium" for the calendar year preceding the assessment in relation to the net earned premium of all carriers for the calendar year preceding the assessment. [*N.J.S.A.*] 17B:27A–12(a)(2). The Reform Act uses a carrier's net earned premium as a proxy for the carrier's market share.... In addition, carriers are assessed their proportion of the administrative expenses incurred by the Individual Health Coverage Program. [*N.J.S.A.*] 17B:[2]7A–11(a).

[*Id.* at 1124–26 (footnote omitted).]

The IHC Act requires all insurance companies, health service corporations and health maintenance organizations authorized or licensed to issue health benefits plans in New Jersey (collectively defined as "carriers"), to offer individual health benefits plans as a condition of issuing any type of health benefits plan in the State. *N.J.S.A.* 17B:27A–4. Concurrently, carriers issuing health benefits plans are subject to an assessment to reimburse IHC Program losses. *N.J.S.A.* 17B:27A–12 and *N.J.A.C.* 11:20–8.1 to 8.9. The

assessments provide a mechanism whereby carriers offering individual health benefits plans to New Jersey residents which sustain losses on those higher risk plans are able to seek reimbursement for their losses. The collective losses of all carriers offering individual health benefits plans in a given calendar year constitute the IHC Program losses for that year. *See N.J.S.A.* 17B:27A–11 and –12. The assessment mechanism of the IHC Act serves as a financial safety net for carriers offering individual health benefits plans.

The IHC Act provides options to enable carriers to fulfill their obligations under the Act. Carriers may elect not to offer any individual health benefits plans and instead pay an assessment. In the alternative, a carrier which elects to offer individual health benefits plans may request an exemption from assessment by agreeing to enroll its fair share of individuals as determined by the IHC Board. *See N.J.S.A.* 17B:27A–12d. Carriers that seek exemptions may thus reduce or avoid assessment altogether if they meet their enrollment targets.

The IHC Act further mandates that the individual health benefits plans to be offered by carriers shall be standard plans developed by the IHC Board of Directors. *N.J.S.A.* 17B:27A–4. The IHC Board has developed five standard indemnity plans and an HMO plan which are set forth in the Program regulations at *N.J.A.C.* 11:20 (Appendix A through F). While every carrier is required to offer all of the five standard plans, the IHC Act, *N.J.S.A.* 17B:27A–4b, includes a limited exception for HMO's which are federally "qualified" pursuant to the Health Maintenance Organization Act of 1973, codified at 42 *U.S.C.A.* § 300e. Accordingly, pursuant to *N.J.S.A.* 17B:27A–4b, a federally qualified HMO may offer an HMO plan in compliance with federal law in lieu of the five standard plans required by the IHC Act.

In electing to enter New Jersey's health benefits marketplace, we deem First Option to have been fully aware of the requirements of the IHC Act and the potential for assessment based on premiums earned on group business written in 1994 and 1995. *In*

re Kovalsky, 195 *N.J.Super.* 91, 98, 477 *A.*2d 1295 (App.Div.1984). The IHC Board determined that because First Option was licensed and in the business of issuing health benefits plans in New Jersey, it was subject to assessment under the IHC Program.

First Option claims that the IHC Board erroneously determined that First Option was liable for 1994 and 1995 IHC Program losses. First Option further argues that it was legally precluded from offering any of the standard plans and thus was incorrectly assessed by the IHC Board. The IHC Board determined that First Option's position was without merit because it was based on an incorrect interpretation of the IHC Act.

On June 1, 1994, First Option received its certificate of authority to operate as an HMO in New Jersey. On August 29, 1994, First Option applied to the federal authorities for federal qualification as an HMO so that it could offer and issue a standard HMO plan in compliance with federal law pursuant to the *Health Maintenance Organization Act of 1973,* codified at 42 *U.S.C.A.* § 300e. Pursuant to *N.J.S.A.* 17B:27A–4b, a carrier authorized to offer the federally approved HMO plan is relieved from offering the five basic health benefit plans required by the IHC Act. First Option did not receive federal authorization to offer the standard HMO plans until December 15, 1995, effective as of November 27, 1995.

The IHC Board refused to allow First Option to issue the standard HMO plan while First Option's application for federal approval was pending. First Option requested that its responsibility for program assessments pursuant to the IHC Act be waived pending federal approval. The IHC Board responded that it lacked authority to waive the IHC program assessment.

We reject First Option's claim that it is not a "member" of the IHC Program and therefore not amenable to assessment for its share of program losses. First Option maintains that it was not a "member" because it was precluded from writing individual

health plans during the time period when it had not obtained approval as a federally qualified HMO.

The IHC Act defines the term "carrier" and "member" in the following manner:

"Carrier" means an insurance company, health service corporation or health maintenance organization authorized to issue health benefits plans in this State. For purposes of this act, carriers that are affiliated companies shall be treated as one carrier.

"Member" means a carrier that is a member of the program pursuant to this act.

[N.J.S.A. 17B:27A–2.]

First Option, having received a certificate of authority under the IHC Act, is clearly a member whether or not it chose to issue any one or more of the five authorized individual health benefits plans. *N.J.S.A.* 17B:27A–10a. First Option was not "prevented" or "precluded" from participating in the individual market. It simply chose not to by not applying for and receiving an indemnity license because it was "both costly and expensive and not realistic for a newly formed HMO." As a carrier "authorized to issue health benefits plans in this State" First Option did issue group plans in 1994 for which it realized a net earned premium of $7,443,348. It realized a net earned premium of $105,076,487 in 1995 from the issuance of both group and non-group (individual) plans.

First Option sought an exemption from 1995 loss assessments pursuant to *N.J.S.A.* 17B:27A–12d by agreeing to enroll or insure a minimum of individual (non-group) persons the number of which was to be determined by the IHC Board. The IHC Board determined the minimum enrolling share of non-group persons for 1995 to be 382. For the last month of 1995, First Option was able to enroll 340 non-group persons and, therefore, earned an 89% *pro rata* exemption from 1995 loss assessments.

Accordingly, the IHC Board assessed First Option $107,227 as its share of reimbursable losses and administrative expenses of the IHC Program for 1994 and made the following conclusion based upon what the IHC Board found to be undisputed facts:

1) First Option's appeal does not raise issues of material fact and does not, therefore, constitute a contested case requiring a hearing, pursuant to the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 *et seq.*;

2) First Option is a "carrier," as defined at *N.J.S.A.* 17B:27A–2, subject to the IHC Act, and is therefore, a "member" of the IHC Program;

3) As a member of the IHC Program, First Option is liable for an assessment to reimburse carriers issuing individual health benefits plans which sustain net paid losses, unless the member has received an exemption from assessment. *N.J.S.A.* 17B:27A–12[;]

4) First Option did not apply for, or receive, an exemption from losses for calendar year 1994, nor did First Option receive from the Commissioner of Insurance relief from the payment of losses in accordance with the IHC Act or IHC Program rules. Since First Option did not apply for an exemption in 1994, its ability to offer individual health benefits plans could not have mitigated its assessment. Therefore, whether First Option was prohibited from offering the standard HMO plan in 1994 is of no relevance to its liability for an assessment for calendar year 1994 reimbursable losses and program expenses[;]

5) For the same reasons stated in (4) above, the IHC Board's treatment of another HMO, with regard to permitting such HMO to offer the standard HMO health benefits plan in lieu of the five standard health benefits plans has no relevance to the question of First Option's liability for payment of an assessment for calendar year 1994 reimbursable losses and program expenses.

For the calendar year 1995, First Option again sought to contest its assessment. The IFC Board confirmed the 1995 assessment of First Option's share of reimbursable losses and administrative expenses in the amount of $192,611 and issued Final Administrative Order No. 96–22 on September 4, 1996.

█ First Option next claims disparate treatment from the IHC Board in respect to the treatment afforded Oxford Health Insurance, Inc. thereby depriving First Option of the equal protection of the laws.

During the early stages of the IHC Program, Oxford was permitted to offer the standard HMO plan while its application for federal authorization was pending. However, unlike First Option, Oxford had made application to operate as an indemnity insurer in New Jersey and, significantly, Oxford neither requested from the IHC Board nor was it granted a waiver of its proportionate share of loss assessments. Consequently, First Option's claim of dispa-

rate treatment is without merit. The factual circumstances of each case are entirely different.

We reject as well the contentions that the IHC Act is unconstitutional as applied by the IHC Board to State licensed but non-federally qualified HMO's. First Option argues that because it was barred from issuing the IHC HMO plan until it received federal authorization, it could not participate in the individual or non-group market. This argument overlooks the step that First Option could have taken to secure indemnity approval during the pendency of its federal application for qualification, a step which Oxford took and received. First Option rejected this alternative because it was costly. As above indicated, Oxford had opted for this alternative prior to receiving federal authorization.

In short, we find, as did the Third Circuit in the *Health Maintenance Organization* case, that the IHC Act has a rational purpose as above set forth. The "pay or play" concept with respect to the individual health benefits insurance market built into the statute is a legitimate device to ensure that health insurance coverage is made available to individual residents of this state who are unable to obtain group or employer-based health coverage insurance. A carrier may elect not to offer any individual health benefits plans but instead offer group plans and therefore "pay" an assessment to cover losses realized by those carriers who write individual plans. In the alternative, a carrier may elect to "play" by agreeing to enroll its fair share of individuals as determined by the IHC Board and thereby enjoy an exemption from such losses. We find applicable our decision in *In re American Reliance Ins. Co.*, 251 *N.J.Super.* 541, 598 *A.*2d 1219 (App.Div.1991), *certif. denied*, 127 *N.J.* 556, 606 *A.*2d 369 (1992), where we rejected an attack on the facial constitutionality of the Fair Automobile Insurance Reform Act of 1990 (FAIR Act), *N.J.S.A.* 17:33B–1 to –63. The FAIR Act imposed an assessment procedure on property liability insurers in order to create a funding mechanism to cover losses incurred with respect to coverage provided for high-risk drivers. The assessments were mea-

sured by a formula relating to the business written by each affected carrier, a concept not too dissimilar from the "pay or play" scheme written into the IHC Act.

 The IHC Act is presumed to be constitutional unless and until the heavy burden of overcoming the presumption of constitutionality is met by the party challenging the law. *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 564–65, 350 *A.*2d 1 (1975). First Option has not met the burden imposed upon it. Our task is not to question the wisdom of the legislation but, rather, to ascertain whether the statute is rationally related to a legitimate public purpose. *See Greenberg v. Kimmelman,* 99 *N.J.* 552, 563, 494 *A.*2d 294 (1985). Clearly, the IHC Act is economic legislation related to a legitimate State interest. *American Reliance, supra,* 251 *N.J.Super.* at 551, 598 *A.*2d 1219.

Also instructive is *New Jersey State Bar Ass'n v. Berman,* 259 *N.J.Super.* 137, 147–49, 611 *A.*2d 1119 (App.Div.1992), where, we upheld as not a violation of equal protection, an assessment upon New Jersey attorneys who, although licensed to practice, did not actively engage in the practice of law. In *Berman,* too, the assessment was designed to help defray the losses incurred by the State in providing liability coverage for high-risk drivers.

 Lastly, we do not perceive any genuine issue of material fact, as urged by First Option, which would have warranted a referral by the IHC Board to the Office of Administrative Law. The loss assessments for the years 1994 and 1995 against First Option were determined by the IHC Board on the basis of undisputed facts and its findings were governed by its interpretation of the IHC Act. *See Cunningham v. Dep't of Civil Service,* 69 *N.J.* 13, 24–25, 350 *A.*2d 58 (1975).

For the foregoing reasons, we do not find the final administrative orders, 96–01 and 96–22, entered by the IHC Board, to be arbitrary, capricious, or unreasonable. The orders were supported by the undisputed facts and the IHC Board's conclusion did not violate the legislative policy expressed in the IHC Act. *See*

*Campbell v. Dep't of Civil Service,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963).

Affirmed.