847 A.2d 552

IN THE MATTER OF THE NEW JERSEY INDIVIDUAL HEALTH COVERAGE PROGRAM'S READOPTION OF N.J.A.C. 11:20–1 ET SEQ.

Argued September 22, 2003—Decided May 10, 2004.

*Eleanor Heck,* Deputy Attorney General, argued the cause for appellant and cross-respondent, Individual Health Care Coverage Program Board of Directors (*Edward M. Neafsey,* Acting Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel).

*John M. Pellecchia* argued the cause for respondents and cross-appellants CIGNA Health Care of Northern New Jersey, CIGNA Health Care of New Jersey, Inc., and Connecticut General Life Insurance Company (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Pellecchia* and *Mary Kathryn Roberts,* of counsel; *Richard Edward Hamilton,* on the briefs).

*Thomas P. Weidner* argued the cause for intervenor-respondent, The United States Life Insurance Company (*Windels Marx*

*Lane & Mittendorf,* attorneys; *Mr. Weidner* and *Samuel G. Destito,* of counsel; *Mr. Weidner* and *David F. Swerdlow,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In this case, we must decide whether the Board of Directors of the Individual Health Coverage Program (IHCP) exceeded its authority by promulgating regulations in conflict with the legislation that gave rise to the IHCP.

## I.

In 1992, the Legislature enacted the Individual Health Insurance Reform Act (the Reform Act or the Act), *N.J.S.A.* 17B:27A–2 to –16.5, to address a looming health care crisis that was making health care coverage both unavailable and unaffordable to many of this State's residents. *In re Individual Health Coverage Program Final Admin. Order Nos. 96–01 and 96–22,* 302 *N.J.Super.* 360, 363–64, 695 *A.*2d 371 (App.Div.1997) (citing *Health Maint. Org. of N.J., Inc. v. Whitman,* 72 *F.*3d 1123, 1124–26 (3d Cir. 1995)). Before passage of the Reform Act, health insurance carriers were reluctant to enter the high-risk market of individual health care coverage because of the losses associated with offering such coverage. *See Health Maint. Org., supra,* 72 *F.*3d at 1125. Those carriers followed the profits, which were to be found in issuing group coverage to employers and sizeable organizations. That grim market reality inevitably created a dearth of affordable individual health insurance coverage (also known as "non-group" coverage). *Id.* at 1124–25. At the time, under State law, Blue Cross and Blue Shield of New Jersey was "the health insurer of last resort" for the individual health insurance market, *In re Blue Cross and Blue Shield of N.J.,* 239 *N.J.Super.* 434, 438, 571 *A.*2d 985 (App.Div.1990), and, therefore, bore a disproportionate share of the losses associated with that market. Those losses drove up the cost of the policies to the point that many residents could no

longer purchase health care for themselves and their families. *Health Maint. Org., supra,* 72 *F.*3d at 1125.

The purpose of the Reform Act was to create a market that would provide affordable individual health care coverage to self-employed and unemployed residents as well as others who did not have the option of purchasing employer-based or group health coverage. *Individual Health Coverage Program, supra,* 302 *N.J.Super.* at 363, 695 *A.*2d 371 (citing *Health Maint. Org., supra,* 72 *F.*3d at 1124–25). The Act created the IHCP, which mandates that all health insurance carriers "offer individual health benefits plans" as a condition of issuing health insurance in this State. *N.J.S.A.* 17B:27A–4a. The aim of the IHCP is to spread the cost of providing individual coverage among New Jersey's entire health care insurance industry, thereby making that coverage more available and affordable to consumers not insured by group policies. *Health Maint. Org., supra,* 72 *F.*3d at 1125. In order to achieve that aim, the IHCP creates incentives for all carriers to write individual policies.

The Reform Act vests the IHCP Board of Directors (the Board or IHCP Board) with the authority to "establish procedures for the equitable sharing of program losses among all members in accordance with their total market share." *N.J.S.A.* 17B:27A–12. The IHCP Board consists of nine representatives: four insurance-carrier representatives elected by the "members," four individual representatives "appointed by the Governor with the advice and consent of the Senate," and the Commissioner of Banking and Insurance or her designee. *N.J.S.A.* 17B:27A–10b. The Act presents insurance carriers with two choices: "pay or play." *Health Maint. Org., supra,* 72 *F.*3d at 1125. To encourage insurance carriers to enter the individual health care market, the Act imposes an assessment on all carriers that fail to issue a minimum number of individual policies. *See N.J.S.A.* 17B:27A–12a(2); *Health Maint. Org., supra,* 72 *F.*3d at 1125. The Board determines the minimum number of individual policies a carrier must issue based on its calculation of a carrier's proportional share

of the overall state health insurance market.[1] A carrier that writes its minimum number of individual policies is entitled to a full exemption from the assessment. *N.J.S.A.* 17B:27A–12d(6).[2] A carrier must first apply for the initial exemption. *N.J.S.A.* 17B:27A–12d. If a carrier meets 100 percent of its target goal, it receives a total exemption; if it falls short of its target number, the carrier is subject to an assessment pursuant to the statutory formula. *N.J.S.A.* 17B:27A–12d(5), (6). A carrier that fails to issue its designated number of individual policies is assessed "on a pro rata basis for any differential between the minimum number established by the board and the actual number covered by the carrier." *N.J.S.A.* 17B:27A–12d(5). The purpose of the assessment is to "reimburse carriers issuing individual health benefits plans" for the losses they sustained in the previous two years. *N.J.S.A.* 17B:27A–12a(2).

### A.

Following passage of the Reform Act, the regulations adopted in 1993 introduced the good-faith marketing requirement as a means of obtaining a pro rata assessment. 25 *N.J.R.* 4196. In 1994, the Board adopted regulations implementing the pro rata assessment scheme for those carriers that failed to write their required minimum number of individual policies. Those regulations estab-

---

[1] *N.J.S.A.* 17B:27A–12d(3) provides:

> The minimum number of non-group person life years required to be covered, as determined by the board, shall equal the total number of non-group person life years of community rated, individually enrolled or insured persons, including Medicare cost and risk lives and enrolled Medicaid lives, of all carriers subject to this act for the two-year calculation period, multiplied by the proportion that that carrier's net earned premium bears to the net earned premium of all carriers for that two-year calculation period, including those carriers that are exempt from the assessment.

[2] The statute provides that a "carrier that applies for the exemption shall be deemed to be in compliance with the [Reform Act] if it has covered 100% of the minimum number of non-group person life years required." *N.J.S.A.* 17B:27A–12d(6).

lished a procedure for granting and denying exemptions, a formula for assessing program losses, and a so-called second-tier assessment to recover shortfalls in the program. 25 *N.J.R.* 4196;–26 *N.J.R.* 1507–09; *N.J.A.C.* 11:20–9.5, 2.17.[3] Six years later, the IHCP Board moved to readopt the regulations, which were set to expire in 1998. 26 *N.J.R.* 1507; 30 *N.J.R.* 3289, 3304–05. CIGNA Health Care of Northern New Jersey, CIGNA Health Care of New Jersey Inc., and Connecticut General Life Insurance Company (collectively, CIGNA) filed a written objection to the proposed regulations, which included amendments to the exemption methodology. The IHCP Board rejected CIGNA's challenge and readopted the regulations on August 4, 1998.

Pursuant to those regulations, a carrier is entitled either to a full exemption, a pro rata exemption, or no exemption. *N.J.A.C.* 11:20–9.5. A carrier that meets 100 percent of its target goal of individual policies receives a full exemption from the assessment. *N.J.S.A.* 17B:27A–12d(6); *N.J.A.C.* 11:20–9.5(a).[4] A carrier that meets fifty percent or more of its target goal receives a pro rata exemption, meaning it will be assessed pro rata "based upon the percentage of the minimum number of non-group persons actually enrolled or insured by the member." *N.J.A.C.* 11:20–9.5(f)(1). A carrier that meets less than fifty percent of its goal, but convinces the Board that it has attempted to market individual policies in

---

[3] For a thorough discussion of those regulatory developments, see *In re N.J. Individual Health Coverage Program's Readoption of N.J.A.C. 11:20–1 et seq.*, 353 *N.J.Super.* 494, 505–07, 803 *A.*2d 639 (App.Div.2002).

[4] *N.J.A.C.* 11:20–9.5(a) is consistent with the Reform Act's provision governing full exemptions, *N.J.S.A.* 17B:27A–12d(6). It states:

A member granted a conditional exemption shall be granted a full exemption from assessments for reimbursements of losses for the two-year calculation period in which the conditional exemption was granted if the Board determines that the information filed by the member pursuant to [*N.J.A.C.* 11:20–9.5(b)] evidences that the member has enrolled or insured 100 percent of the minimum number of non-group persons allocated to it by the Board for that two-year calculation period.

[*N.J.A.C.* 11:20–9.5(a).]

good faith,[5] also receives a pro rata exemption. *N.J.A.C.* 11:20–9.5(f)(2). Finally, a carrier that fails to pass the Board's good-faith marketing test and meets less than fifty percent of its target goal receives no exemption at all. *Ibid.* To enable the Board to determine whether a carrier is entitled to a pro rata exemption because it has made a good-faith marketing effort, the carrier must submit a comprehensive report describing its efforts.[6] *N.J.A.C.* 11:20–9.6.

The regulations also create a so-called second-tier assessment, an additional assessment through which to recover shortfalls in the program created by the granting of full and pro rata exemptions.[7] *N.J.A.C.* 11:20–2.17(c). The second-tier assessment regulation applies only to those carriers that fail to receive a full or pro rata exemption from the initial assessment. *Ibid.* Carriers that receive a pro rata exemption at the first level are not subject to

---

[5] According to the regulations, the Board determines whether a good-faith marketing effort has been made based on whether a carrier, in proportion to its minimum market share, has undertaken "a significant media advertising or other marketing campaign" or "significant efforts . . . to educate licensed insurance producers about its standard individual health benefits plans . . . in New Jersey and offered to pay competitive commission schedules for sales of such plans and competitive rates." *N.J.A.C.* 11:20–9.6(c).

[6] The report must include the names of all print and broadcast advertisements, copies of those advertisements, and detailed information about direct marketing efforts. *N.J.A.C.* 11:20–9.6(a). In those cases in which the Board finds that the insurer has not made a good-faith effort, it must "notify the member in writing as to its reasons for not granting the member a pro rata exemption on or before the date that the Board issues bills for assessments for reimbursements for losses for that two-year calculation period." *N.J.A.C.* 11:20–9.5(f)(2).

[7] When promulgated in 1994, the second-tier assessment was designed to make up any shortfalls in the program caused by *N.J.S.A.* 17B:27A–12e, which stated that no carrier would be liable for an assessment exceeding thirty-five percent of the aggregate net paid losses of all carriers filing. *Individual Health Coverage Program, supra,* 353 *N.J.Super.* at 506–07, 803 *A.2d* 639. That provision has since been repealed, *L.* 1997, *c.* 146, § 6, but the second-tier assessment has endured as a method of compensating for program shortfalls by making certain carriers liable. See *N.J.A.C.* 11:20–2.17(c).

the additional assessment. *N.J.A.C.* 11:20–2.17(c)(1)(ii).[8] Accordingly, only those carriers that have insured less than fifty percent of their allocated share of individual policies and fail to meet the Board's good-faith marketing scrutiny are subject to the second-tier assessment.

### B.

CIGNA appealed the Board's adoption of the regulations to the Appellate Division. The appellate panel first rejected the carriers' broad-based challenge to the Board's rule-making authority under the Reform Act in which CIGNA claimed that the regulations were promulgated in violation of the Administrative Procedure Act. *Individual Health Coverage Program, supra,* 353 *N.J.Super.* at 512–20, 803 *A.2d* 639. The panel then found that the regulation restricting the second-tier assessment solely to those carriers that failed to receive full or partial exemptions was contrary to the Reform Act, and, therefore, invalid. *Id.* at 523–26, 803 *A.2d* 639. Last, the panel upheld the good-faith marketing credit of *N.J.A.C.* 11:20–9.5(f)(2) and –9.6, reasoning that the credit furthered the legislative intent underlying the Reform Act by creating an incentive for carriers to market greater numbers of individual policies. *Id.* at 520–23, 803 *A.2d* 639. Nevertheless, the panel acknowledged that there was a colorable claim that the Board had exceeded its authority by permitting pro rata exemptions for carriers that received the good-faith marketing credit. *Id.* at 521, 803 *A.2d* 639.

The IHCP Board sought certification, claiming that the Appellate Division erroneously invalidated an essential part of its assessment program aimed at enhancing the availability of health coverage in New Jersey. We granted the Board's petition for certification to review the appellate panel's decision to void the

---

[8] "A carrier that has been granted a pro rata exemption under *N.J.A.C.* 11:20–9.5 shall not be liable for that portion of the loss assessment that is reapportioned as a result of the granting of final (full or pro rata) exemptions." *N.J.A.C.* 11:20–2.17(c)(1)(ii).

second-tier assessment. 175 *N.J.* 170, 814 *A.*2d 635 (2002). We later granted CIGNA's cross-petition for certification challenging the legality of the good-faith marketing requirement upheld by the panel. 178 *N.J.* 106, 835 *A.*2d 321 (2003) (vacating original denial, 175 *N.J.* 170, 814 *A.*2d 635 (2002), and granting cross-petition).

We agree with and affirm Judge Stern's well-reasoned opinion striking down the second-tier assessment regulation based on its present methodology. We conclude, however, that the good-faith marketing provision in *N.J.A.C.* 11:20–9.5(f)(2) and –9.6 exceeds the Board's regulatory authority and, accordingly, reverse that limited portion of the appellate panel's decision.

## II.

An agency regulation, like a legislative act, is presumed to be valid and the burden is on the challenger to show either that the regulation is inconsistent with its enabling statute or is plainly arbitrary. *Medical Soc'y of N.J. v. New Jersey Dep't of Law and Public Safety, Div. of Consumer Affairs,* 120 *N.J.* 18, 25, 575 *A.*2d 1348 (1990); *Bergen Pines County Hosp. v. New Jersey Dep't of Human Serv.,* 96 *N.J.* 456, 477, 476 *A.*2d 784 (1984). The presumption of validity does not attach if the regulation on its face reveals that the agency exceeded the power delegated to it by the Legislature. *Medical Soc'y of N.J., supra,* 120 *N.J.* at 25, 575 *A.*2d 1348. Administrative regulations "cannot alter the terms of a statute or frustrate the legislative policy." *Ibid.; see also In re Adoption of Amendments to N.J.A.C. 6:28–2.10, 3.6 and 4.3,* 305 *N.J.Super.* 389, 402, 702 *A.*2d 838 (App.Div.1997) (stating that regulation will be set aside if it "plainly transgresses the statute that it purports to effectuate or if it alters the terms of the statute or frustrates the policy embodied by it") (internal quotation marks and citation omitted). Therefore, although this Court " 'places great weight on the interpretation of legislation by the administrative agency to whom its enforcement is entrusted,' " *Medical Soc'y of N.J., supra,* 120 *N.J.* at 26, 575 *A.*2d 1348 (quoting *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 69–70, 389 *A.*2d 465

(1978)), we must look to the statute to determine the extent of the agency's delegated authority. *See Chopper Express, Inc. v. Dep't of Ins.*, 293 *N.J.Super.* 536, 542, 681 *A.*2d 1226 (App.Div.1996) (stating that administrative power derives solely from Legislature and "agency cannot by administrative fiat" give itself authority not legislatively delegated). When an agency, in promulgating a regulation, arrogates to itself a power that has not been delegated to it by the Legislature, it has acted arbitrarily and capriciously.

## A.

We first look to the Reform Act to determine whether the IHCP Board was authorized by the Legislature to promulgate the regulations concerning the second-tier assessment and the good-faith marketing condition to the pro rata exemption. The Reform Act requires the "fair, reasonable, and equitable" sharing of program losses in a "proportionate" manner. *N.J.S.A.* 17B:27A–10d; *see also N.J.S.A.* 17B:27A–12a(2) (requiring assessment of "every member" which has not written its required coverage). The Act provides that

[t]o the extent that the carrier has failed to cover the minimum number of non-group person life years established by the board, the carrier shall be assessed by the board on a pro rata basis for any differential between the minimum number established by the board *and the actual number covered by the carrier.*

[*N.J.S.A.* 17B:27A–12d(5) (emphasis added).]

*N.J.S.A.* 17B:27A–11a vests the Board with the authority to "assess members their proportionate share of program losses and administrative expenses in accordance with the provisions of [*N.J.S.A.* 17B:27A–12]." The Board is mandated to "establish procedures for the equitable sharing of program losses among all members in accordance with their total market share." *N.J.S.A.* 17B:27A–12. We conclude that the regulations at issue constitute a " 'rare circumstance[ ] when it is clear that the agency action is inconsistent with the legislative mandate.' " *In re Township of Warren*, 132 *N.J.* 1, 26, 622 *A.*2d 1257 (1993) (quoting *Williams v. Dep't of Human Serv.*, 116 *N.J.* 102, 108, 561 *A.*2d 244 (1989)).

## B.

■ We agree with the appellate panel's thorough analysis of the infirmity of the second-tier regulation. The Reform Act provides that in given circumstances health insurance carriers issuing individual policy coverage are entitled to reimbursement for their losses. *N.J.S.A.* 17B:27A–12a(1)(b).[9] Those reimbursements are funded through assessments levied on "every" healthcare carrier unless the carrier has received an exemption from the Board pursuant to *N.J.S.A.* 17B:27A–12d as a result of issuing its minimum number of non-group policies. *N.J.S.A.* 17B:27A–12a(2). Those carriers writing their "minimum number" of individual policies are entitled to a full exemption from the first assessment pursuant to the statute, *N.J.S.A.* 17B:27A–12d(6), and a full exemption from the second-tier assessment pursuant to the regulation, *N.J.A.C.* 11:20–2.17(c). Under the Reform Act, all other carriers are subject to either pro rata or full assessments. *N.J.S.A.* 17B:27A–12d(5).

The current regulatory scheme permits carriers writing at least fifty percent of their target number of individual policies to receive a pro rata exemption on the initial exemption, *N.J.A.C.* 11:20–9.5(f)(1), and a complete exemption on the second-tier assessment, *N.J.A.C.* 11:20–2.17(c)(1)(ii). Thus, non-exempt carriers that write less than fifty percent of their target number and who fail to convince the Board that they marketed individual policies in good faith, are left to shoulder the entire burden of the second-tier assessment and, therefore, a disproportionate amount of the program losses. The language of the Reform Act does not square with giving carriers that fail to write their target number of individual policies a full exemption from the second-tier assessment. See *N.J.S.A.* 17B:27A–12a(2) (requiring assessment of "every member" that has not written its required coverage).

---

[9] The Reform Act provides that if a carrier's claim for a two-year calculation period exceeds 115% of that carrier's net earned premium and investment income during the two-year period, the amount of the excess is considered that carrier's reimbursable loss. *N.J.S.A.* 17B:27A–12a(1)(b).

A regulation that exempts carriers that meet only fifty percent of their goals from any second-tier assessment, while requiring certain carriers meeting forty-nine percent and less of their goals to bear the entire cost, is not in line with the legislative authority that mandates an "equitable sharing of program losses" among all carriers. *See N.J.S.A.* 17B:27A–12. The Reform Act provides for carriers to receive pro rata assessments based on the difference between the number of individual policies they were required to write and the number of policies actually written. *N.J.S.A.* 17B:27A–12d(5). The regulation is completely at odds with that statutory formula and, thus, cannot be sustained. *See New Jersey Tpk. Auth. v. AFSCME, 73,* 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997) (stating well-settled principle that no deference shall be given to agency interpretation of statute that is contrary to statutory language or legislative intent).

Moreover, the regulation arguably works as a disincentive to an insurance carrier to write 100 percent of its target enrollment because that carrier gains a second-tier assessment exemption by meeting only fifty percent of its goal. That result is contrary to the legislative aim of encouraging carriers to write policies in proportion to their fair share of the market. *See Health Maint. Org., supra,* 72 *F.*3d at 1124–26. We do not suggest that a second-tier assessment that comports with the Reform Act would be invalid. Our decision is limited to the present methodology that restricts the class of carriers subject to the second-tier assessment in a manner contrary to the Reform Act.

Accordingly, we affirm the Appellate Division's invalidation of *N.J.A.C.* 11:20–2.17 as amended effective August 7, 1998, and conclude that the regulation conflicts with the statutory pro rata assessment scheme and the legislative policy of spreading losses among the entire insurance industry.

### C.

▉ The analysis that compels us to invalidate the second-tier assessment regulation applies with equal force to the regulation

that gives credit to a carrier for its good-faith marketing efforts. Unlike the appellate panel, we cannot conclude that the good-faith marketing regulation is consistent with the assessment scheme of the Reform Act.

The good faith provision gives a pro rata exemption to carriers that fall short of writing fifty percent of their target goal of individual policies so long as they engage in good-faith marketing efforts. *N.J.A.C.* 11:20–9.5(f)(2) and –9.6. The Board argues that an agency is permitted to take actions required to effectuate legislative intent, even if that action is not expressly authorized by statute. It defends its regulation by arguing that it promotes the paramount goal of increasing greater individual insurance coverage by creating an incentive for insurers to make significant marketing efforts in offering such coverage. The Appellate Division agreed, finding that the agency could reasonably conclude that the provision would fulfill the Reform Act's salutary objective of encouraging carriers to offer individual policies to high-risk individuals. *Individual Health Coverage Program, supra,* 353 *N.J.Super.* at 522, 803 *A.*2d 639. The panel noted that "a carrier must 'pay' unless it 'plays,' " and, therefore, saw "no reason in the statute why [a carrier] cannot be required to show that it really 'played,' or tried to 'play,' when it fell more than 50 percent short." *Ibid.* The panel acknowledged, however, that the regulation "presents a colorable basis for the claim that the Board exceeded its authority." *Id.* at 521, 803 *A.*2d 639.

We conclude that the Board acted beyond its delegated authority because the good-faith marketing regulation contravenes the loss-sharing methodology required by the Reform Act. As noted, *N.J.S.A.* 17B:27A–12 requires the Board to "establish procedures for the *equitable* sharing of program losses." (Emphasis added.) *N.J.S.A.* 17B:27A–12d(5) provides that a carrier that fails to write its designated minimum number of policies will be assessed pro rata by the Board based on the "differential between the minimum number established by the board and the actual number covered by the carrier." That language evinces a clear legislative intent to

assess carriers on the basis of results. The good-faith marketing regulation alters the terms of the statute because it allows insurers to receive a pro rata assessment based on factors other than their actual participation in the market. See *Medical Soc'y of N.J., supra,* 120 *N.J.* at 25, 575 *A.*2d 1348 (noting that administrative regulation cannot alter terms of its enabling statute). It permits a carrier that writes as little as ten percent of its market share of policies to be credited as though it had written greater than fifty percent, allowing that carrier to receive a pro rata assessment in the first-tier and a total exemption in the second-tier. That administrative grant of relief, though well-intentioned and grounded in public policy, is at odds with the statute's pro rata assessment provision that mandates assessment based on the difference between the target number and the actual number of policies written. *N.J.S.A.* 17B:27A–12d(5).

We are mindful of the Board's argument that this Court should defer to its interpretation of the statute because it is the agency charged with implementing the Reform Act. This Court grants considerable deference—but not blind deference—to an agency's interpretation of its enabling statute. *See, e.g., Peper, supra,* 77 *N.J.* at 69–70, 389 *A.*2d 465; *Medical Soc'y of N.J., supra,* 120 *N.J.* at 26, 575 *A.*2d 1348. We cannot accept that the good-faith marketing requirement is a reasonable interpretation of the statute, which explicitly requires the assessment of carriers based on the number of policies written.[10] Although we recognize the Board's laudable policy motivation—the creation of incentives for carriers to market individual polices—the Board cannot change the statutory formula for the sharing of losses under the guise of administrative interpretation. *See In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 450, 608 *A.*2d 288 (1992) (holding that agency

---

[10] We do not address the suggestion in CIGNA's brief that *N.J.A.C.* 11:20–9.5(f)(1), which limits pro rata assessments to only those carriers that meet fifty percent of their target enrollments, may conflict with the Reform Act. CIGNA's claim appears to be that a carrier that writes any number of individual policies, whether ten percent or ninety percent of its target goal, is entitled to pro rata assessment relief. That issue is not before us.

may not give statute greater effect than permitted by statutory language). Although the Reform Act is far from a model of clarity, the goal of the Act is not ambiguous. The Act intended each carrier to write its targeted number of individual policies or bear the assessment on a pro rata basis. We conclude that the Board's good-faith marketing regulation is contrary to equitable loss-sharing considerations at the core of the IHCP and the "pay or play" policy codified by the Reform Act. *See Health Maint. Org., supra,* 72 *F.*3d at 1125. We, therefore, hold that *N.J.A.C.* 11:20–9.5(f)(2) and –9.6 are in conflict with their source statute because they permit a scheme for the inequitable apportioning of program losses.

### III.

We affirm the judgment of the Appellate Division invalidating the second-tier assessment regulation as presently written and reverse its judgment upholding the good-faith marketing regulation.

*For affirmance in part; reversal in part*—Chief Justice PORITZ and Justice LONG, VERNIERO, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.